## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARY MELLENTHIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05 C 3688 |
| v. | ) | |
| | ) | |
| | ) | |
| SBC-AMERITECH, | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mary Mellenthin sued her former employer Ameritech Advanced Data Services of Illinois, Inc. ("Ameritech") claiming that Ameritech violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") by giving her a verbal warning and a negative performance evaluation and later demoting her because of her sex.  She also claims that Ameritech retaliated against her for filing an EEOC charge and subjected her to a hostile work environment. Mellenthin also claims that Ameritech, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, terminated her employment because of her alleged disability and failed to reasonably accommodate her.  She further claims that Ameritech terminated her in retaliation for having filed a second EEOC charge.  Finally, she alleges that Ameritech intentionally subjected her to emotional distress. Defendant Ameritech moves for summary judgment on all counts.  For the following reasons, that motion is granted in part and denied in part.  Ameritech's motion to strike certain paragraphs of plaintiff's amended/corrected local rule 56.1 statement of additional facts and certain paragraphs of plaintiff's amended/corrected response to defendant's statement of undisputed facts is granted to the extent described herein.

**BACKGROUND**

In February 2004, Mellenthin began working as a complex bid manager for Ameritech at a facility in Arlington Heights, Illinois. Mellenthin worked as part of an organization known as Bid Central. She was responsible for preparing price quotes for installation of network equipment at customer locations. Mellenthin worked under the supervision of Bruce Gregory, the Associate Director for the Complex Bid Program, who worked out an office in Texas. Dave Gentilini was a complex bid manager in the organization, but he also performed functions as the team lead.

Gregory measured the performance of the complex bid managers against certain criteria. Gregory expected bid managers to complete bids within a 48-hour (designated "AVVID") or 72-hour (designated "non-AVVID") timeframe, depending on the type of bid, and he expected them to review and log all jobs within four hours of initial receipt. Gregory judged each bid manager based, among other things, on the total number of bids completed and the total value of the bids completed. Gregory also expected bid managers to be accessible to him via telephone, e-mail, and an instant messaging system known as "Q."[1]

In 2004, Gregory noticed certain problems with Mellenthin's job performance. Specifically, he noticed that Mellenthin often missed the 48/72 hour turn-around time for bids and that she often took too long to review jobs upon assignment. Gregory also received multiple complaints regarding Mellenthin's work from the National Pricing Center (the organization that sent jobs to Bid Central).[2]

---

[1] Mellenthin attempts to deny Def's Fact ¶ 16 that she was directed to be on "Q" at all times, but her attempt fails in that the evidence she cites, "Mellenthin Dep. I, pg.156"does not say anything about the "Q" messaging system.

[2] Mellenthin's attempt to deny Def's Facts ¶¶ 19 and 21 is unsuccessful. The evidence she cites does not support her denial.

As of October 2004, Gregory also noted that Mellenthin ranked near the bottom of the team in the number of bids completed and dollar value of bids for the third quarter of 2004. In October 2004, based on his concerns regarding Mellenthin's late turn-around times for projects, her taking too long to review projects at the outset, and complaints he received from the National Pricing Center, Gregory directed Gentilini to speak with Mellenthin about her job performance and give her a verbal warning,[3] and Gregory personally followed-up with a telephone call and e-mail to Mellenthin. Despite the verbal warning, Mellenthin felt that her performance did not need improvement.

At the end of 2004, Gregory completed an annual performance review for Mellenthin in which he noted her continuing problems with the 48/72-hour turn-around times, her inaccessibility and lack of timely response to communications, complaints he received regarding her work, and her display of a "defensive attitude rather than a willingness to improve." Ameritech's Statement of Undisputed Facts ("Def's Fact") ¶ 30.

In April 2005, Mellenthin filed an EEOC charge alleging that Gregory discriminated against her based on sex in issuing her the verbal warning and negative performance evaluation.

In mid 2005, Gregory was required to designate one complex bid manager as "surplus" (i.e., he had to eliminate one complex bid manager from his team as part of a reduction in force ("RIF")). He designated Mellenthin. In lieu of termination, Mellenthin was able to secure another, lower-level position within Ameritech as a customer service specialist working for supervisor Jeff Siegel, and she began work in this job around July 21, 2005 at the same Arlington Heights facility.

According to Mellenthin, she was exposed to a chemical at work at the Arlington Heights

_____

[3] Mellenthin's attempt to deny Def's Fact ¶ 20 is unsuccessful. The evidence she cites does not support her denial.

facility on July 27, 2005. When moving to a new work station, Mellenthin found herself in a locked stairwell. In the stairwell, Mellenthin experienced difficulty breathing, her eyes teared, and she felt "caustic discomfort" in her nose and throat. Mellenthin's Statement of Additional Fact ("Pl's SAF") ¶ 17. According to Cindy Noland, Ameritech's Rule 30(b)(6) witness, the "front desk" started receiving reports that people were feeling symptoms in their breathing passages, nasal passages and bronchial passages. Pl's SAF ¶ 18. Mellenthin returned to work for about six weeks after the chemical exposure, but from September 15, 2005 onward, she never returned to work and was on a leave of absence. From September 15, 2005 to mid-February 2006, Mellenthin received paid disability benefits.

Mellenthin contends that she has post-traumatic stress syndrome ("PTSD"), depression, anxiety, panic attacks, and occasional blackouts resulting from the chemical exposure. Mellenthin claims that she can no longer multi-task, she cannot travel on an airplane, she needs a support person for stressful situations, she has trouble thinking, she isolates from contact with others, and has difficulty dealing with confrontations with people.

During 2006, Mellenthin requested that Ameritech accommodate her disabilities by returning her to work at a different building. Ameritech refused that request. Mellenthin filed a second EEOC charge in May 2006 alleging disability discrimination. After Mellenthin lost her appeal of Ameritech's February 2006 cancellation of her paid disability benefits, her supervisor, Jeff Siegel, sent Mellenthin a letter requiring her to return to work by July 12, 2006. Mellenthin failed to return to work and her employment was terminated effective July 13, 2006.

## ANALYSIS

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 248. The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).

**Discrimination Based on Mellenthin's Gender**

Under Title VII, a plaintiff may prove her employment discrimination case either by direct or indirect evidence. Direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus," *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003), and is "rarely found." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). When a plaintiff lacks direct evidence, she may utilize the burden-shifting method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination by demonstrating that she: (1) belongs to a protected class, (2) performed her job to his employer's legitimate expectations, (3) suffered an adverse employment action despite performing satisfactorily, and (4) received less favorable treatment than similarly-situated employees outside the protected class. *Hildebrandt v. Ill. Dep't of Nat'l Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003); *Hughes v. Brown,* 20 F.3d 745, 746 (7th Cir. 1994). If the plaintiff succeeds, the burden shifts to the defendant to provide legitimate, non-discriminatory reasons for its conduct; and if the defendant succeeds, the

burden shifts back to the plaintiff to show that the defendant's reasons were pretextual. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004).

### 1. The Verbal Warning and Negative Performance Evaluation

Ameritech attacks Mellenthin's claim on the third and fourth elements, arguing that the verbal warning and the negative performance evaluation were not "adverse employment actions" and that Mellenthin failed to show that she received less favorable treatment than men who were similarly-situated. Because Mellenthin fails to satisfy the fourth element, the court need not address whether these events qualify as "adverse employment actions."

Ameritech argues that Mellenthin has not identified a similarly situated male employee who was treated more favorably than she. The court agrees. Employees are similarly situated when they have a common supervisor and possess "analogous attributes, experience, education, and qualifications" relevant to the position. *Radue,* 219 F.3d at 618. Mellenthin, apparently believing that Ameritech did not argue that she could not meet the "similarly situated" comparator requirement, stated tersely in a footnote that "Plaintiff's evidence demonstrates that she was disciplined more harshly than similarly situated employees who were not women[.]" On the contrary, Ameritech's motion does argue that Mellenthin "cannot show that a similarly situated employee was treated more favorably with regard to [the verbal warning and the negative performance evaluation]." Def's Mem. at 4. Mellenthin has failed to put forward any evidence showing that a male employee, who had a common supervisor and "analogous attributes, experience, education and qualifications," and who was similar to Mellenthin in terms of performance, was treated more favorably than she. For this reason, Ameritech's motion for summary judgment on Mellenthin's gender discrimination claim based on the verbal warning and negative performance

evaluation is granted.

## 2. Mellenthin's Designation As "Surplus"

With respect to Mellenthin's claim that Ameritech designated her as "surplus" (her demotion to a customer service job) because she was a woman and also in retaliation for her having filed an EEOC charge, Ameritech argues that Mellenthin cannot meet her *prima facie* burden for either claim.[4]

Focusing its attack on the "similarly situated" requirement of the standard *prima facie* formulation for discrimination and retaliation claims, Ameritech argues that none of the employees put forward by Mellenthin are "similarly situated" to her. As discussed above, employees are similarly situated when they have a common supervisor and possess "analogous attributes, experience, education, and qualifications" relevant to the position. *Radue,* 219 F.3d at 618. Associate Director Gregory testified in his deposition and averred in an affidavit that he chose Mellenthin for surplus because: (1) relative to her peers she had a low total number of bids and a low dollar value of bids quoted in 2004 and 2005; (2) Gregory believed that Mellenthin often failed to meet the stated timelines for turning around quotes; (3) Gregory believed that Mellenthin was slow in identifying issues with respect to bids at the outset, which further exacerbated her turn-around time issues; (4) Gregory received a large number of complaints from the National Pricing Center and others regarding Mellenthin's work; (5) Gregory believed that Mellenthin was not communicating

---

[4] Mellenthin asserts that the court should apply the "mini-reduction-in-force" *prima facie* formulation. The court disagrees. The "mini-RIF" formulation only applies where the plaintiff's job is "unique" and where a plaintiff's duties are subsumed by members not in the protected class. *Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 845 (7th Cir. 2007). Here, Mellenthin's job was not "unique" – she was one of eleven complex bid managers – and, according to Mellenthin, her duties were assumed by another woman, Angela To-Pham, who is not outside the protected class (i.e., Mellenthin's duties were not taken over by a man).

effectively because she was either not accessible or was not prompt in returning calls, emails, or "Q" instant messages; (6) Gregory believed that Mellenthin had not improved sufficiently after coaching by him and had not demonstrated sufficient willingness to improve; and (7) Gregory believed that Mellenthin's skills, experience and training were less than those of Mildred Denise Maclin (the other complex bid manager who Gregory considered closely for surplus based on job performance issues).[5]

Mellenthin points to four[6] male complex bid managers – Gray, Gentilini, Atkins and Metzger – who she claims were treated more favorably than she. With respect to Gray, Mellenthin states that he "failed to meet the 48/72 hours turn around time and were [sic] the subject of complaints from the [National Service Center]." Mellenthin provides nothing which would inform the court as to the volume of complaints received about Gray – team leader Gentilini stated at his deposition that there were "some" complaints about Gray, but he couldn't recall any specifics of the complaints. Mellenthin presents evidence from Gray's 2004 evaluation that Gray did not meet the goal of completing 95% of his bids on time. Rather, he completed 77% of his AVVID and 85% of his non-AVVID on time. On his 2005 evaluation, Gregory stated that "[Gray] completed 461 bids. His response time for these bids was 74 percent overall. 121 out of 461 was not completed within the goal of 48/72 hours. This represents a further decline from the mid-year review when [Gray] was

---

[5] In responding to Ameritech's Fact ¶ 41, Mellenthin attempts to deny that these were the reasons relied upon by Gregory in selecting her for surplus. This attempt fails, however, because she cites to evidence which was not included in her exhibits. The court could find no page 2008 in Mellenthin's deposition, and it is not the court's job to find evidentiary support for a party.

[6] While Mellenthin failed to identify Atkins and Gray in her deposition as comparable employees, the court will allow her to present her argument that they are also "similarly situated" to her.

81 percent." Finally, Mellenthin claims that she ranked higher than Gray with respect to the dollar amount of bids and total number of bids.

The court does not find Gray to be comparable to Mellenthin for a number of reasons. It is undisputed that Gregory reviewed, among other things, the rankings for the bid managers for the 2004 and the first six months of 2005 (he designated Mellenthin "surplus" in June 2005). For both 2004 and the pertinent part of 2005, it is true, as Ameritech asserts, that Mellenthin ranked lower than Gray in both dollar amount of bids and total number of bids.[7] But, in 2004, not by much. While Mellenthin's 2004 rankings (8th and 9th) seem somewhat comparable to Gray's 2004 rankings (7th and 8th), they must be viewed in context. In understanding whether the slight difference in rankings is meaningful, the court notes that there were only eleven bid managers getting ranked. The court is more comfortable calling Mellenthin's rankings "inferior" (as Ameritech does) to Gray's in 2005, when her rankings were 8th in number of bids and 7th in dollar amounts and Gray's were 7th in number of bids and 4th in dollar amounts. In his affidavit, Gregory explained that a split in rankings (such as Gray's 7th and 4th) indicates that while Gray had fewer bids, at least some of his bids were more lucrative (hence, the lower ranking for number of bids and higher ranking for dollar amount). The court does not credit Mellenthin's attempts to argue that her rankings were actually superior to Gray's, because she only looked at the first three months of 2005, when her numbers improved somewhat, as opposed to the longer 2004-2005 timeframe considered by Gregory in making his surplus decision.

---

[7] In 2004, Gray ranked 7th in number of bids and 8th in dollar value of bids, while Mellenthin ranked 8th and 9th in those categories, respectively. From January to June 2005, Gray ranked 7th in number of bids and 4th in dollar value of bids, which Mellenthin ranked 8th and 7th in those categories.

If all Gregory relied upon in selecting Mellenthin was how she fell in the bid manager rankings in 2004, it would be a close call on whether or not Gray was similarly situated to Mellenthin. However, the court must look at the entire 2004-05 timeframe, which included six months in 2005 when Gray ranked 7th in bids and 4th in dollar value of bids, while Mellenthin ranked 8th and 7th in those categories. In the end, Mellenthin's rankings during the relevant timeframe were inferior to Gray's, and this fact weighs against a finding of similarity between the two.

The issue of rankings, however, is only one of series of considerations that formed the basis for Gregory's decision to designate Mellenthin as "surplus." For Gray to be considered similar to Mellenthin for purposes of the *prima facie* test, he must have also exhibited the same type of performance problems as she did during the relevant timeframe. While Mellenthin points to Gray's 2004 evaluation to support the notion that he, too, had problems with his turn-around times, neither Mellenthin nor Ameritech does much in terms of argument to help the court make the appropriate comparisons. In reviewing the parties' facts, the court was able to discern that, in 2004, Gray did not complete 95% of his bids on time. Specifically, he completed 77% of his AVVID bids and 85% of his non-AVVID bids within the applicable time limits. Gray's 2005 evaluation indicates that he was at 81% in terms of meeting the time goals at mid-year.[8] In 2004, Mellenthin also missed the goal of completing 95% of her bids on time. She completed 90% of her AVVID bids within 48 hours and 75% of her non-AVVID bids within 72 hours. Def's Fact ¶ 30. For 2005, the only

_____

[8] For Gray in 2005, the court does not have any evidence of the individual AVVID/non-AVVID percentages (as were given for 2004), but only has a total combined percentage for both. Pl's SAF ¶ 7. In addition, the percentages given in Gray's 2005 evaluation for the end of 2005 are not relevant here as the surplus decision was made in June 2005.

evidence presented with respect to this issue for Mellenthin is that "[d]uring 2005, Gregory ... continued to discover that Plaintiff was often not meeting the 48/72 hour turn-around requirement." Def's Fact ¶ 39.

With respect to the timeliness issue in 2004, Gray and Mellenthin are similar – Gray averaged 81% and Mellenthin averaged 82.5% in timely bids. For 2005, the court has no way of comparing Gray and Mellenthin without Mellenthin's percentage for January through June 2005. The one thing that is supported by the evidence is that neither Gray nor Mellenthin met their timeliness goal in 2005, and both continued to have problems in that area. With respect to this performance issue, it appears that Mellenthin and Gray were similar in that neither one met the timeliness goals set by Gregory.

According to Ameritech, another reason Gregory selected Mellenthin for "surplus" had to do with the large number of complaints he received about her from the National Service Center. While there is evidence that team lead Gentilini received "some" complaints about Gray, there is no evidence at all that Gregory, who was the decisionmaker here, knew of any complaints about Gray. According to Gregory, he received more complaints about Mellenthin "than... all the other bid managers combined or close to it." Def's Fact ¶ 21.[9] With respect to complaints, Mellenthin and Gray were not similarly situated.

Finally, there is no evidence that Gray demonstrated the additional problems that also led to Mellenthin's designation as surplus; namely, there is no evidence that Gray was not

_____

[9] Mellenthin's attempt to deny Ameritech's Fact ¶ 21 is unsuccessful. Rather than citing to evidence that would dispute Gregory's assertion, she argues that Gregory and/or Gentilini never provided the specifics of the complaints to her. This, even if true, is beside the point, and does not call into question Gregory's assertion.

communicating effectively by not being accessible via telephone, emails, or the "Q" instant messaging system, nor is there any evidence that Gray did not improve after coaching or had shown he was unwilling to improve. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) ("To meet her burden of demonstrating that another employee is 'similarly situated,' a plaintiff must show that there is someone who is directly comparable to her in all material respects."). In looking at Mellenthin's performance as a whole, and the fact that Gray did not suffer from many of the same performance problems as Mellenthin, the court does not find him similar enough to Mellenthin to meet the *prima facie* element. While he may have been similar to her on some issues (specifically, the turn-around problems), he was not similar to her with respect to bid rankings, the volume of complaints, communication problems, coaching issues and defensiveness. In light of this, the court concludes that Gray is not comparable to Mellenthin.

With respect to Gentilini, Mellenthin contends that he too failed to meet the standard for the 48/72 hour turn-around times. However, it is undisputed that Gentilini had time-consuming team lead duties on top of his regular duties as complex bid manager, thus making him dissimilar to Mellenthin. *Id.* at 680 (finding plaintiff not similarly situated to employee who had different job responsibilities). In addition, Mellenthin makes no attempt to present evidence that Gentilini ranked lower than Mellenthin in both dollar amounts of bids and total amount of bids during the 2004-2005 timeframe.[10] Likewise, she fails to explain how her performance is otherwise similar to Gentilini's

---

[10] Once again, Mellenthin, instead of using the rankings from the relevant timeframe (2004-2005), focuses solely on one quarter in 2005 to argue that her ranking with respect to the total number of bids was higher than Gentilini. As Gregory explained, however, Gentilini's low number of bids in this period was offset by the fact that he ranked second in the dollar value of his bids (reflecting the fact that while he had fewer bids, some of those bids were more lucrative and time-consuming).

(e.g., she does not contend that he had issues with communications, responsiveness, or a defensive attitude). Accordingly, Gentilini is not similarly situated to Mellenthin for purposes of the surplus decision.

Finally, with respect to Atkins and Metzger, Mellenthin provides no argument or evidence that they were similarly situated to her during the 2004-2005 time frame. She merely asserts that she ranked higher than them during one quarter in 2005, but she fails to provide any analysis regarding the relevant time period. In addition, she fails to explain how her performance is otherwise similar to either Atkins' or Metzger's (e.g., she does not contend that they had issues with communications, responsiveness, or a defensive attitude). She also fails to discuss if either man had any issues with respect to meeting turn-around times. Accordingly, Mellenthin's comparison to Atkins and Metzger fails.

**Mellenthin's ADA Claims – Discrimination and Failure to Accommodate**

Mellenthin asserts two ADA claims – one based on a discriminatory termination as well as a failure to accommodate claim.[11] To establish a *prima facie* case of discrimination, a plaintiff must show that (1) she is a qualified individual with a disability; (2) that her work met the legitimate expectations of the defendant; (3) that she suffered an adverse employment action; and (4) that she was treated differently from a similarly situated employee. *See, e.g., Morrisey v. Health Care Serv. Corp.*, No. 02 C 3150, 2004 WL 42369, at *5 (N.D. Ill. Jan. 7, 2004). Similarly, to prevail on a

---

[11] Ameritech argues that Mellenthin's ADA claims should be restricted to discrimination in the form of her termination and failure to accommodate, as these were the bases listed on her EEOC charge. While Mellenthin lists "subjecting [her] to different terms and condition of employment" and "denying [her] benefits" in her Second Amended Complaint, she may not pursue these as she is limited to those bases listed in her EEOC charge. *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202-203 (7th Cir. 1996).

failure to accommodate claim, a plaintiff must show that (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed reasonably to accommodate the disability. *EEOC v. Sears, Robuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). Both claims require a plaintiff to show that she is a "qualified individual with a disability." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). While Ameritech and Mellenthin dispute whether there was an accommodation that would have allowed Mellenthin to continue to perform the duties of her customer service job, the court need not address that issue because it concludes that Mellenthin is unable to establish that she has a ADA-cognizable disability.

Under 42 U.S.C. § 12102(2)(A),[12] a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." In interpreting the provision, the Supreme Court has made clear that "to be substantially limited ... an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives" and that "the impairment's impact must be permanent or long term." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002). EEOC regulations interpret the ADA to define the phrase "major life activities" to include "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking,

---

[12] With respect to Mellenthin's assertion in her response brief that she also should be allowed to survive summary judgment on the basis of the fact that she was "regarded as" having a disability under 42 U.S.C. § 12102(2)(C), the court finds such an argument to be waived. *See, e.g.*, *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (citing cases). The court can find no argument whatsoever in Mellenthin's brief which would support such a position.

breathing, learning, and working." *Patterson v. Chicago Ass'n For Retarded Citizens*, 150 F.3d 719, 725 (7th Cir. 1998) (citing 29 C.F.R. § 1630.2(i)).

Ameritech has put forward undisputed evidence that Mellenthin is not severely restricted in performing activities that are of central importance to her daily life. Mellenthin's therapist and her psychiatrist both testified that she has always been able to attend to the activities of her daily life since the alleged chemical exposure that caused her present condition. Mellenthin is able to drive herself, take care of herself and her personal hygiene, do household chores, cook, pay her utility bills, use a computer, use e-mail, write letters, and play volleyball, and she sometimes goes to the grocery store without accompaniment. She lives by herself and has friends with whom she associates.

Mellenthin claims that she has a disability because she can no longer multi-task (e.g., she cannot talk on the phone and do something else simultaneously), she cannot travel on an airplane, she needs a support person for stressful situations, she has trouble thinking, she isolates from contact with others, and has difficulty dealing with confrontations with people. However, she has put forward no authority or argument for the notion that any of these are "major life activities." The only "major life activity" that Mellenthin claims to be limited in is "working." To establish that she is substantially limited in the major life activity of working, however, Mellenthin must demonstrate that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person[.]" *Patterson*, 150 F.3d at 725. Here, Mellenthin has failed to put forward any evidence that she is unable to perform a class of jobs or a broad range of jobs. Especially dooming is her assertion that she can perform independently all of the functions of her former complex bid manager job (a job that involved thinking, stressful

deadlines, and interactions with others). Indeed, her ability to work as a complex bid manager and

a host of other jobs for which she applied after her termination unquestionably demonstrates that she

is not unable to work at a class or broad range of jobs. Instead, Mellenthin is merely limited in her

ability to perform the single job of customer service specialist. This limitation, even if she had it,

does not constitute a substantial limitation in the major life activity of working. *Id.* ("an inability

to perform a particular job for a particular employer is not sufficient to establish a substantial

limitation on the ability to work; rather, the impairment must substantially limit employment

generally.").

### Retaliation Based on Mellenthin's EEOC Charges

Mellenthin alleges that Ameritech retaliated against her after she filed her first EEOC charge

by designating her as "surplus," and then again, after she filed her second EEOC charge, when it

terminated her. A plaintiff bringing a retaliation claim can survive summary judgment in two ways:

by means of either the direct or the indirect methods. *Stone v. City of Indianapolis Pub. Utils. Div.*,

281 F.3d 640, 644 (7th Cir. 2002). Under the direct method, the plaintiff must establish a *prima facie*

case by presenting direct evidence that: (1) she engaged in statutorily protected activity; (2) she

suffered an adverse employment action; and (3) there is a causal connection between the two. *Luckie*

*v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). A plaintiff proceeding according to the direct

method of proof may rely on two types of evidence: direct evidence or circumstantial evidence.

*Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). "[D]irect evidence is evidence

which, if believed by the trier of fact, will prove the particular fact in question without reliance upon

inference or presumption." *Id.* (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998)).

Circumstantial evidence is evidence that allows a jury to infer intentional discrimination by the

decisionmaker.  *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003).

Under the indirect or "burden-shifting" method, the plaintiff must establish that: (1) he engaged in statutorily protected activity; (2) he was performing his job according to his employer's legitimate expectations; (3) despite his satisfactory performance, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *Luckie*, 389 F.3d at 714.  If the plaintiff succeeds in proving his *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action.  *Hilt-Dyson v. City of Chicago*,  282 F.3d 456, 465 (7th Cir. 2002).  Once the employer has done so, the burden of production shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual in nature.  *Id.*

In laying out her retaliation claims, Mellenthin appears to rely on the direct method.  That is, she states that she must show that she engaged in a statutorily protected expression, that she suffered an adverse employment action even though she was performing her job satisfactorily, and that there is a causal link between the protected expression and the adverse action.  *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1459 (7th Cir. 1996).  However, later in her discussion, she mentions an individual that she feels is similarly situated.  In light of this, the court will analyze her retaliation claims under both the direct and indirect methods of proof.

Both of the adverse employment actions Mellenthin suffered (the designation as "surplus" and the termination) came approximately two months after she filed charges with the EEOC.[13]  Under the direct method of proof, Mellenthin must show, among other things, that there is a causal link between

_____

[13] Mellenthin alleges that Ameritech designated her as "surplus" on June 20, 2005 because she filed an EEOC charge on April 13, 2005.  Mellenthin also alleges that Ameritech terminated her on July 13, 2006 because she filed a second EEOC charge on May 25, 2006.

the protected expression and the adverse action. To show this causal link, Mellenthin argues that "The temporal [sic] of Defendant's action of designating Mellentihin [sic] as surplus shortly after she filed her second charge of discrimination support [sic] an inference of retaliation." Pl's Resp. at 16. The court assumes Mellenthin meant to argue that the temporal proximity of her designation as "surplus" after she filed her *first* charge of discrimination is enough to show the required causal link. Further, she makes no argument regarding a "causal link" between the second charge and her termination. The court assumes that she intended to argue temporal proximity for both retaliatory actions.

Unfortunately for Mellenthin, it is well established that temporal proximity, standing alone, is almost always insufficient to show a "causal connection." *Stone*, 281 F.3d at 644 (mere temporal proximity will rarely be sufficient in and of itself to create a triable issue). And, in any event, a lapse of two months (or even less) has been rejected by many courts as too attenuated to support a causal link showing. *See, e.g., Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 904-05 (7th Cir. 2005 ) (one month lapse insufficient); *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) (lapse of one month insufficient); *Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 928 (N.D. Ill. 2005) (four weeks between events not sufficient to support inference of causal link). However, "[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided there is other evidence that supports the inference of a causal link." *Lang v. Ill. Dep't. of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004). But Mellenthin has failed to point to any "other evidence" which would support the inference of a causal link. Because of this, she has failed to meet one of the required elements in the direct method of proof.

Mellenthin's proof also fails under the indirect method. In order to survive summary

judgment, Mellenthin must put forward evidence of a similarly situated employee who did not engage in protected activity and was treated more favorably. In a single sentence, Mellenthin states that "Gray, who did not file a charge was similarly situated to plaintiff was not given a verbal warning, designated as surplus, or discharged." Mellenthin's attempt to draw parallels between herself and Gray fail for the rudimentary reason that she failed to put forward any evidence that Gray did not engage in any protected activity. Further, the court has already determined that Gray was not similar to Mellenthin with respect to her designation as "surplus." And Mellenthin fails to make any argument (or present any evidence) whatsoever that Gray was similar to her with respect to her termination (by showing, perhaps, that he did not file a charge, was out of work for some reason, and was not terminated). Mellenthin's undeveloped and unsupported argument is waived. *See, e.g.*, *Smith*, 388 F.3d at 569. For all these reasons, Mellenthin's retaliation claims fail.

**Hostile Work Environment Claim**

In its motion, Ameritech specifically moved for summary judgment on Mellenthin's Title VII sexual harassment claim. Mellenthin, however, failed to respond to Ameritech's argument on that claim. Nor has Mellenthin provided any facts or evidence to support a claim of sexual harassment. A party opposing summary judgment cannot simply rest on the pleadings but must come forward with some evidence in support of her claim to avoid dismissal. For this reason, many courts in this situation have entered summary judgment for the movant on an abandonment theory. *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming plaintiff's negligence claim abandoned because he failed to argue it either in his district court brief in opposition to summary judgment or in his brief on appeal); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996) (plaintiff abandoned claim after failing to respond to arguments in defendant's motion

for summary judgment); *Kowalczyk v. Walgreen Co.*, 2005 WL 1176599, at *11 (N.D. Ill. May 17, 2005) (finding plaintiff abandoned claim by failing to respond to defendant's summary judgment arguments on that claim);.

However, precedent from the Seventh Circuit also indicates that a court "may not automatically award summary judgment when the non-moving party stands on his pleadings." *Thornton v. Evans*, 692 F.2d 1064, 1074 (7th Cir. 1983). Instead, the moving party must still carry his burden of showing the absence of genuine issues of material fact. *Id*. at 1075. Even if the court did not deem Mellenthin's sexual harassment claim to be abandoned, the undisputed facts show that Ameritech is entitled to summary judgment on Mellenthin's sexual harassment claim. Ameritech argues that Mellenthin failed to exhaust her administrative remedies with respect to any claim for sexual harassment because she never included allegations related to sexual harassment in her first EEOC charge (which dealt with gender discrimination). This fact is undisputed. In light of this failure, Mellenthin is barred from pursuing such a claim in this suit. *Cheek*, 97 F.3d at 202-03.

**Intentional Infliction of Emotional Distress**

In order for Mellenthin to prove a claim for intentional infliction of emotional distress ("IIED") under Illinois law, she must prove: (1) that Ameritech's conduct was extreme and outrageous; (2) that Ameritech knew there was a high probability that its conduct would cause severe emotional distress or was intended to cause severe emotional distress; and (3) that Ameritech's conduct in fact caused severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). "The tort does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). "[T]o serve as a basis for recovery, the defendant's conduct must be such that the 'recitation of the facts to an average member

of the community would arouse his resentment against the actor, and lead him to exclaim[:] Outrageous!'" *Id.* (quoting *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994).

When an injury occurs in the workplace, however, the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/1 (2007), *et seq.*, provides the exclusive remedy for accidental injuries. The IWCA is designed to provide financial protection to workers for accidental injuries arising out of and in the course of employment. *Meerbrey v. Marshall Field & Co., Inc.*, 564 N.E.2d 1222, 1225 (Ill. 1990).

Mellenthin does not dispute that to avoid preemption by the IWCA she must demonstrate one of the following: (1) the injury was not accidental; (2) the injury did not arise from her employment; (3) the injury was not received during the course of her employment; or (4) the injury is not compensable under the Act. *Meerbrey*, 564 N.E.2d at 1226. Mellenthin's IIED claim rests on an allegation that certain Ameritech managers (who are not identified by Mellenthin in her response brief or her statement of additional facts) desired to cause her harm by refusing to provide information about the chemical exposure at work. Mellenthin argues that: "Although Plaintiff's exposure to the an [sic] unknown chemical exposure [sic] appears to be negligent, the failure to disclose the identity of the chemical to plaintiff was extreme and outrageous conduct." Pl's Resp. at 17.

"The IWCA exclusivity provisions will not bar a common law cause of action against an employer . . . for injuries that the employer or its alter ego intentionally inflicts upon an employee or which were commanded or expressly authorized by the employer." *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1016-17 (7th Cir. 1997) (citing *Meerbrey*, 564 N.E.2d at 1222). In other words, Mellenthin may avoid preemption if she can show that Ameritech

intended to harm her. The court concludes that neither party provided it with the evidence it needs to conclude that there is no material fact in dispute with respect to the issue of intent. While the court acknowledges that Mellenthin's statement of additional facts suffers from some serious evidentiary problems, the court is not inclined to grant summary judgment on this technical basis. According to Mellenthin's affidavit, "Despite repeated requests, SBC refused to disclose the identity of the unknown chemical to which I was exposed." Pl's Aff. at 23. Therefore, she has put forward evidence that Ameritech acted intentionally in withholding information from her regarding the chemical exposure, at least for some period of time immediately following the exposure. This evidence could serve as circumstantial evidence of an intent to injure Mellenthin. However, without an understanding of what Ameritech knew and when, no conclusions about intent are possible. In its statement of undisputed facts, Ameritech provides four facts, none of which explain if there was a chemical exposure[14] (the fact that others also complained about physical symptoms suggests that there was), how long it took Ameritech to identify the source of the complaints, and why Ameritech refused to disclose the chemical to Mellenthin (including, whether it did in fact, "refuse" or whether it told her when it uncovered the identity of the chemical). All of this missing information would assist the court in determining whether Ameritech intended to injure her when it withheld critical information from her. At this point, and considering the failure of both parties to provide obviously

---

[14] Ameritech never tells the court if Mellenthin was actually exposed to freon. It points to Mellenthin's testimony in which she states that her supervisor, Jeff Siegel, told her the chemical was freon, but describes that conversation and all mention of the exposure using the adjective "alleged," implying that this is only Mellenthin's version of events. This uncertainty, as well as the dearth of other facts which would explain when Ameritech knew the identity of the chemical and why it did not share this information with Mellenthin sooner, lead the court to conclude that summary judgment is not proper based on this record.

relevant evidence,[15] the court concludes that the question of intent is one for a jury to decide.

Thus, the question of preemption under the IWCA and whether or not Mellenthin can meet the second IIED element will be left to the jury. In addition, the court will not grant summary judgment on the IIED claim on the basis that Ameritech's conduct was not "extreme and outrageous." To determine whether the conduct is extreme and outrageous, the court must employ an objective standard, and should consider the following nonexclusive factors: "the degree of power or authority which a defendant has over a plaintiff; whether the defendant reasonably believed that his objective was legitimate; and whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity." *Lewis v. School Dist. #70*, 523 F.3d 730, 746 (7th Cir. 2008). Neither party addresses any of the factors the court must consider in its analysis. In addition, the parties' failure to present a full version of the facts with respect to this claim makes it impossible for the court to determine whether the "extreme and outrageous" element has been met. Due to these failures, the court denies Ameritech's motion for summary judgment. The court's denial of summary judgment on the IIED claim is without prejudice; if Ameritech can come forward with additional facts, the court will consider a second motion for summary judgment on this claim.

**Ameritech's Request for Fees and Costs**

Ameritech has moved for an award of reasonable attorneys' fees and costs incurred in preparing its motion to strike Mellenthin's summary judgment factual submissions. A court may

---

[15] The court is aware that another district court in this circuit found an intentional tort claim to be preempted under the IWCA where an employer knew its workers may have been exposed to vinyl chloride, a harmful chemical, and did not share this information with its employees. *Bogner v. Airco, Inc.*, 353 F. Supp. 2d 977, 983 (C.D. Ill. 2005). However, in light of the deficient presentation of facts on this claim, the court is unable to discern whether or not *Bogner* is directly on point and, if so, whether this court will follow it.

order an attorney who "multiplies the proceedings ... unreasonably and vexatiously" to bear the adversary's costs and attorneys' fees. 28 U.S.C. § 1927. Ameritech argues, in essence, that it is entitled to fees and costs associated with its first motion to strike because it did Mellenthin's work for her by pointing out all of the flaws in her response to Ameritech's statement of undisputed facts as well as numerous problems with her own statement of additional facts. According to Ameritech, because the court allowed Mellenthin to file a corrected version of her response and facts *after* Ameritech pointed out all the flaws, Mellenthin unfairly reaped the benefit of Ameritech's work.

Ameritech relies on *In re TCI*, 769 F.2d 441, 442 (7th Cir. 1985), for its assertion that "In submitting summary judgment evidentiary materials that were so riddled with basic errors that they necessitated a detailed Motion to Strike from Ameritech, Plaintiff's counsel has engaged in conduct that the Seventh Circuit warned can result in the imposition of sanctions under 28 U.S. C § 1927." Def's Reply at 2. Having reviewed *In re TCI*, the court cannot conclude that Ameritech's statement is supported by that case. In *In re TCI*, TCI's attorneys filed two "unjustified" adversary proceeding complaints in a bankruptcy proceeding, and "[w]hen [TCI's] adversaries demonstrated that the pleadings were without substance, ... [the law firm] revised them slightly and filed them twice more." 769 F.2d at 442. The bankruptcy judge concluded that the adversary proceeding complaint had been "framed and prosecuted ... without any effort to ascertain whether it had a basis in law." *Id*. at 444. The court found that the actions of TCI's attorneys violated their duty to "limit litigation to contentions well grounded in fact and ... warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." *Id.* (quoting Fed. R. Civ. P. 11). This court, while understanding Ameritech's frustration with the careless work on the part of Mellenthin's attorney, does not view attorneys who file sloppy summary judgment responses on the same level as

attorneys who knowingly pursue frivolous legal claims, even after having the inadequacies highlighted for them by opposing counsel.

The court declines to award fees and costs associated with Ameritech's motion to strike. As evidenced by the fact that Ameritech filed a second motion to strike based on numerous problems in Mellenthin's *corrected* filings, the court is not convinced that Mellenthin actually drew much benefit from Ameritech's motion. As Ameritech itself states in its second motion to strike: "Even though Ameritech previously moved to strike Plaintiff's original Local Rule 56.1 submissions and highlighted numerous deficiencies in those submissions, substantial parts of both of Plaintiff's Amended/Corrected Local Rule 56.1 submissions remain invalid." Def's Second Mot. to Strike at 1. Ameritech goes on, "In essence, Plaintiff has not corrected many of the evidentiary flaws previously noted by Ameritech and has actually created new flaws." *Id.* The court's own comparison of Mellenthin's original filings with her corrected filings confirms Ameritech's assertions.

In the event the court declines Ameritech's request for fees and costs associated with the motion to strike, Ameritech asks that it be given fees and costs associated with its additional reply brief. The court declines this as well. In its reply to Mellenthin's corrected filings, Ameritech states that "[d]espite having been given an opportunity to amend her summary judgment response after seeing Ameritech's summary judgment reply brief, Plaintiff has made almost no consequential changes to the factual assertions or legal arguments in her summary judgment response brief." Def's Reply at 1. The court's side-by-side comparison of Ameritech's initial reply brief with its second reply brief filed after Mellenthin's corrected filings reveals very minimal changes (to the first paragraph only, with the remaining 17 pages appearing the same in both briefs). In light of the fact that Ameritech was able to re-use its entire reply brief, the court declines to award any fees or costs.

**CONCLUSION**

For the reasons described above, Ameritech's motion for summary judgment [93] is granted in part and denied in part. Ameritech's first motion to strike [119] is denied as moot. Ameritech's second motion to strike [152] is granted to the extent described herein. Ameritech's motion to recover its attorneys' fees and costs [134] is denied.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  September 29, 2008